UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

STEPHANIE MAE BARNICA,

    Plaintiff,

v.                                       Case No. 13-C-1012

CAROLYN COLVIN,

    Defendant.

**DECISION AND ORDER**

Plaintiff filed this action challenging the decision of the Commissioner of Social Security denying her disability benefits. For the reasons given below, the decision of the Commissioner will be affirmed.

**I. Background**

Plaintiff is thirty-three years old and a mother of four children. She alleged disability beginning in February 2009 due principally to mental health problems she had suffered, some of which were long-term and others which were caused or exacerbated by the fact that she had witnessed a boyfriend sexually abusing her children around that time. At the time of the hearing, she lived in a rented home with her extended family, including her parents and siblings, as well as her own children. (Tr. 34.) She testified that prior work had included cleaning hotel rooms and offices. She later began working as a certified nursing assistant but left that job after being "locked up" due to neglect of her children. (Tr. 35, 45.)

Plaintiff testified that she was no longer able to work due to emotional ups and downs, as

well as forgetfulness and trouble concentrating. "I'm depressed. I avoid people. I have problems dealing with people." (Tr. 36.) "Whenever I get around people, I feel tense and nervous, and so I . . . I have to do a lot of, like, slow, deep breaths and self-talk." (Tr. 40.) A typical day included helping with her kids (e.g., getting them ready for school and taking them to and from school) and then needing to sleep to recover from the exertion. When she was able to work prior to the onset date, she had the energy and desire to be around people and enjoyed helping them. (Tr. 43.) But now, "it's too overwhelming." (Tr. 44.)

**II. Analysis**

The Commissioner's final decision will be upheld if the ALJ applied the correct legal standards and supported his decision with substantial evidence. 42 U.S.C. § 405(g); *Jelinek v. Astrue,* 662 F.3d 805, 811 (7th Cir.2011). Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Skinner v. Astrue,* 478 F.3d 836, 841 (7th Cir.2007).

**A. Factual Errors**

Plaintiff first argues that the ALJ made certain factual mistakes that require reversal. For example, the ALJ concluded that the Plaintiff had not been receiving mental health counseling (as she had testified), when in fact she had been in treatment with counselor Diana Ditloff since July 2009. Plaintiff believes the ALJ used this apparent contradiction to undercut Plaintiff's credibility.

First, there is no indication that the ALJ drew any conclusions from the contradiction cited because the ALJ simply mentions it in passing. Second, the ALJ did not actually state there was a contradiction. Instead, the full sentence reads: "Although the claimant testified that she had been receiving mental health treatment since the alleged onset date, records show that she was first seen

2

14 months after the alleged onset date in June 2010 at American Foundation of Counseling." (Tr. 17.) What the ALJ pointed out is true: there are no records of any treatment with a counselor named Diana Ditloff in the medical records. And Plaintiff's own testimony was extremely limited on the subject. She testified that she had been in in-home counseling "since this happened" (i.e., the sexual assault of her children), but there was no indication as to the frequency or nature of the counseling. In sum, there is no evidence either that the ALJ made a factual error, nor that the error was material to any of the ALJ's conclusions.

The second error Plaintiff identifies is the ALJ's statement that Plaintiff had called her child a liar in relation to the investigation of sexual assault. The ALJ's full statement reads as follows: "In May 2009, the claimant reported that she wanted to take her statement back as she did not think the man had ever touched her child (Exhibit 9E at 8). The child later stated that the claimant called her a liar when she reported what had happened (Exhibit 9E at 8)." (Tr. 19.) Plaintiff notes that the police report actually states that the *defendant* was the party who called the child a liar—not Plaintiff. (Tr. 206-206.) Thus, she believes that the ALJ manifestly erred in relying on that incorrect information.

Again, however, it is unclear how this error would have affected the ALJ's decision. The child's own credibility is not at issue in these proceedings. The point the ALJ was making was that at one stage the Plaintiff wanted to "take her statement back," which indicates she must actually have believed her child was lying (or at least mistaken) about the assault incident. The fact that it may actually have been the defendant, rather than Plaintiff, who *called* the child a liar has nothing to do with the ALJ's point, which was about the Plaintiff's credibility, not the child's: "The claimant's oscillating reports about what happened suggest that she may not consistently report the

3

truth." (Tr. 19.) The fact remains that Plaintiff experienced some difficulty and hesitation in reporting the incident, and then she apparently attempted to change her story. The ALJ was entitled to make note of this, and, although the inference to be drawn is a limited one, it certainly does not have anything to do with who actually called the child a liar.

Moreover, it is clear that the ALJ did not rely on these statements to make her credibility finding. Instead, far more salient was the ALJ's observation that Plaintiff had not engaged in substantial gainful employment since 2002—seven years prior to the alleged onset date. The ALJ's point was that the Plaintiff had rarely demonstrated any motivation to maintain full-time employment even when she was healthy, and thus it was more difficult to believe that Plaintiff's inability to work was legitimately due to a disability. Although not dispositive of the credibility issue (because people can in fact become disabled during long periods of unemployment), it is certainly not error to highlight the fact that there is little history of attempting to be gainfully employed even while healthy. Under such circumstances, an ALJ may reasonably be suspicious that financial gain is the primary motivator. In fact, the ALJ pointed out that Plaintiff had reported she applied for benefits because "I need it financially." (Tr. 19-20.) The therapist's remarks were as follows: "At this point, Stephanie is not able to work due to being charged with neglect of her children and reports that she has applied for Social Security disability because 'I need it financially.'" (Tr. 282.) The ALJ also cited the therapist's statement that "it appears that a number of family members are on disability." (Tr. 20, 282.) None of these factors alone is a smoking gun on credibility, but they create a mosaic of someone whose credibility it would be reasonable to discount.

4

**B. Medical Opinions**

The Plaintiff next argues that the ALJ improperly weighed the medical evidence by relying on the state agency (non-examining) psychologists' opinions rather than those of treating sources. An ALJ must give "controlling weight" to a treating source's opinion if it is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with other substantial evidence." 20 C.F.R. § 404.1527(d)(2). "And whenever an ALJ does reject a treating source's opinion, a sound explanation must be given for that decision." *Punzio v. Astrue,* 630 F.3d 704, 710 (7th Cir. 2011).

Here, the ALJ gave little weight to the opinion of William Secor, a social worker, who opined that Plaintiff's symptoms were rather severe. For example, Secor found marked limitations in activities of daily living and in maintaining concentration, persistence or pace. (Tr. 335.) He also cited extreme limitations in maintaining social functioning. (*Id.*) The ALJ rejected these conclusions in part because Secor is not an acceptable medical source. 20 C.F.R. § 416.913(a). The ALJ also noted that the grim description of Plaintiff's abilities contrasted with the fact that Secor found a GAF (Global Assessment of Functioning) score of 55, which indicates only moderate limitations rather than anything as severe as what Secor described. (Tr. 18.) In addition, the ALJ noted that the marked limitations Secor found stood in contrast to Plaintiff's actual daily activities and Secor's own treatment notes.

The ALJ properly gave Secor's opinion little weight. Plaintiff's own testimony was not nearly as bleak as the May 2012 form Secor filled out, which is suggestive of crippling anxiety and a general inability to even function at the most basic levels. By contrast, Plaintiff merely said that she often lacked energy and sometimes got worn out by the day's activities; she also had significant

5

social anxiety issues. She was able to care for her children, prepare meals, drive around town, attend various functions and school events, and visit the library. And these were not just her "good days," they were part of her routine. Although it is true she often avoided interacting with people due to social anxiety, there was not an indication in the record or in her own testimony that severe anxiety affected all aspects of her daily life. In fact, as even Secor noted, at one point she rated the anxiety level as a seven on a one-to-ten scale, indicating that her anxiety, while real, was no more severe than that of millions of citizens who suffer from anxiety disorders and yet do not qualify for disability benefits.

Plaintiff also saw Yogesh Pareek, MD on a number of occasions. In 2012, at the time of Secor's report, Dr. Pareek's treatment notes indicate that Plaintiff was doing much better after switching to Lexapro, an antidepressant. (Tr. 320.) In an April 2012 follow-up, she reported she was "doing well" despite still having "some feelings of depression." (Tr. 319.) The psychiatrist continued her on 10 mg of Lexapro. She was not taking other psychiatric medications. Thus, it was not surprising that Dr. Pareek assessed a GAF of 60, which indicates only moderate to mild symptoms or functional limitations. What appears somewhat unusual is that in the same form Dr. Pareek noted a striking number of areas in which Plaintiff was "unable to meet competitive standards." (Tr. 326.) These included such abilities as remembering work procedures, understanding simple instructions, and making simple decisions. (Tr. 326.) The ALJ rejected these conclusions and gave Pareek's opinion little weight because it was not consistent with his treatment notes, which had not made such dim observations and which in fact had noted that she had been doing well. (Tr. 19.) In addition, Dr. Pareek only saw the Plaintiff every three months and continued her on a relatively low dosage of Lexapro, with no other medications, which suggested

her condition was not severe. The ALJ also noted that the limitations were not consistent with the GAF score.

The ALJ's reasons for rejecting Dr. Pareek's opinion were sound. As with Secor's worksheet, Dr. Pareek's form contained a much more dire description of Plaintiff's symptoms than is found anywhere else in the record, including Plaintiff's own testimony and her statements to Dr. Pareek himself (e.g., "I'm doing well"), which are contemporaneous with the worksheet rather than cherry-picked from different time periods. (Tr. 319.) I note that the forms Secor and Dr. Pareek completed were provided by Plaintiff's attorneys and the record does not reflect the circumstances surrounding their completion. (Tr. 323, 330.) It may be that the involvement, or perhaps even the presence, of an attorney influenced them. In any event, it is unclear why Dr. Pareek believed Plaintiff could not, for example, understand simple instructions or make simple decisions. There is no evidence of such cognitive difficulty in the record, which is instead suggestive of someone of average intelligence who struggled with clinical depression, anxiety and possible PTSD due to her children's sexual assault.

The GAF score of 60 requires some elaboration, as Plaintiff challenges the meaningfulness of that number. First, although GAF scores are certainly not dispositive, they are sometimes used by courts as short-hand assessments of a claimant's limitations. For example, in *Blevins v. Astrue,* the court affirmed the Commissioner's decision to end benefits after a claimant's GAF score rose from 43 to 51 after five years. "Here, as the ALJ noted, consultative examining psychologist Frank Choate in 2007 had measured Blevins' GAF score at 51—higher than the score of 43 that Dr. Hauschild had measured five years earlier and within the range of only "moderate" symptoms or difficulty in functioning." 451 Fed.Appx. 583, 585, 2011 WL 6118571, 2 (7th Cir. 2011). But, as

7

the Seventh Circuit has also noted, GAF scores may sometimes be of limited use in determining functional limitations. "GAF scores . . . are 'useful for planning treatment,' and are measures of both severity of symptoms and functional level. . . . Because the 'final GAF rating always reflects the worse of the two,' the score does not reflect the clinician's opinion of functional capacity." *Denton v. Astrue*, 596 F.3d 419, 425 (7th Cir. 2010). Thus, in some cases (like *Denton*) a GAF score may not represent a claimant's functional limitations because the score could be based on severity of symptoms rather than functional level, and thus the functional level could be much greater than the symptom severity. That is, a low GAF score might not be material because the actual functional limitations could be less severe than the score indicates (because the score represents the *worse* of the severity of symptoms and functional level). This is not a case like *Denton,* however, because here even if the scores (55 to 60) represent the providers' opinion about the severity of symptoms rather than functional limitations, that means the functional limitations would be *less* severe than the GAF score indicates. In other words, at worst, Plaintiff's functional limitations would have been in the moderate range.

GAF scores can also be problematic because they are "snapshots" of a particular moment rather than a longer-term prognosis. *See Sambrooks v. Colvin,* ——Fed.Appx.——, 2014 WL 2700119, at *5 (7th Cir. June 16, 2014). Thus, in *Punzio v. Astrue,* it was error for the ALJ to cite a high GAF score on one date and use that score to demonstrate that a later evaluation was inconsistent with the earlier GAF assessment. 630 F.3d 704, 710 (7th Cir. 2011). That is an improper approach because "a person who suffers from a mental illness will have better days and worse days, so a snapshot of any single moment says little about her overall condition." *Id.* In other words, the fact that someone might be doing well on one day (with a high GAF score) does not

mean she will be doing well on another, and so there is no contradiction when treatment notes conflict over time.

GAF scores can also be troublesome if an ALJ plucks a single score out of the record and places too much emphasis on it. The recent case of *Yurt v. Colvin* is an instructive contrast. There, an ALJ denied benefits after a state agency psychologist noted that the claimant's GAF score of 60 "suggests minimal impairments." --- F.3d ----, 2014 WL 3362455 (7th Cir. July 10, 2014). The court reversed, however, noting that the score of 60 was the *highest* score that claimant had received; in fact, the claimant had recently received scores as low as 25 and 30 after psychotic episodes requiring hospitalization. *Id.* The court found that the psychologist and the ALJ had therefore improperly cherry-picked the single high GAF reading to find no disability. *See also Farrell v. Astrue,* 692 F.3d 767 (7th Cir. 2012) (claimant had one moderate GAF score of 51 but also had several as low as 30).

The GAF score is thus rife with traps for the unwary, primarily because the reductive simplicity of a single score often poses a tempting shortcut that can lead ALJs and courts astray. Here, however, the ALJ did not err in citing the GAF score. First, it is clear that the ALJ did not say that the claimant had a GAF score of 60 and therefore was not disabled. Second, the ALJ did not cherry-pick a single positive GAF score out of the record. Third, the ALJ did not cite a GAF score from earlier treatment. Instead, the ALJ simply pointed out that the GAF scores appeared to be at odds with the worksheets filled out by Dr. Pareek and Secor, the social worker. The relatively benign score of 60 (mild-moderate limitations) is found on the first page of Dr. Pareek's evaluation in which Pareek then proceeds to conclude the claimant cannot follow (or even *understand*) simple instructions, which is a dramatic and unsupported limitation in functioning. Even toddlers can

9

understand simple instructions. Plaintiff was a high school graduate who obtained average grades and had no history of cognitive limitations, and she was able to participate fully in her hearing. (Tr. 235.) Thus, the contradiction the ALJ cited is not one based on cherry-picking a single score out of the record, but is instead an apparent contradiction within the same document, i.e., the very same "snapshot" of her mental health.[1]

Of course the apparent inconsistency of the GAF score was just one factor in the ALJ's analysis. The ALJ also cited the conservative treatment Dr. Pareek prescribed, and Plaintiff does not even argue that this was error. By April 2012, Plaintiff was still experiencing some depression, but Pareek continued her on 10 mg of Lexapro with no other medications. ALJs and courts can sometimes get into trouble if they "play doctor" and read too much into a physician's treatment program. However, when viewed in light of the contemporaneous 2012 statements that Plaintiff was "doing well" (Tr. 319) and "doing quite well" (Tr. 320), it is reasonable for a non-physician reviewer to at least remark on the fact that a physician has not prescribed a more intensive course of medication and therapy.

In short, the notes from Dr. Pareek in 2012 are strongly suggestive of someone who suffers from major depression but who is reasonably controlling it with a limited course of medication. There are no indications that Plaintiff would have any of the extreme limitations Dr. Pareek cited in his worksheet. (Tr. 325-328.) An ALJ may discount a treating physician's medical opinion

---

[1]The Plaintiff accuses the ALJ of cherry-picking good reports out of the record, but Plaintiff herself frequently cites her worst treatment notes as though those should be dispositive. For example, in 2010 Steven Jansen, MS stated that Plaintiff was "in the throes of a major depressive episode." (Tr. 237.) But that was before medication and the improvements seen with Dr. Pareek that are noted in 2012. And once again, the GAF score at that time was assessed at "55 to 60." (*Id.*)

10

"when the treating physician's opinion is internally inconsistent, as long as [the ALJ] minimally articulates his reasons for crediting or rejecting evidence of disability." *Skarbek v. Barnhart,* 390 F.3d 500, 503 (7th Cir. 2004). Here, the reasons cited by the ALJ were much more than minimally articulated, and in fact they are sound.

**C. Reliance on State Agency Physicians**

Plaintiff also argues that it was error to rely on the opinions of the state agency physicians because their opinions are contradicted by the record as a whole. In January 2011, Edmund Mushold, Ph.D., conducted a review of the records and wrote a narrative functional capacity assessment. He noted that Plaintiff has a history of depression, as well as some hesitation in social situations due to trust issues, but that she cooks and does chores occasionally, drives, shops and handles her own finances and "does fairly well with instructions," although she might need repeats. (Tr. 260.) Ultimately, he concluded that "Cl[aimant] has issues w[ith] depression, anxiety and personality disorders. However, she retains the ability to handle simple, routine tasks in a low stress environment w[ith] minimal social interaction." (*Id.*) This finding was affirmed by another reviewing psychologist. (Tr. 318.)

The ALJ gave these opinions significant weight because they were consistent with the record as a whole and because the reviewing psychologists had expertise in reviewing medical records and assessing RFCs. (Tr. 19.) Plaintiff cites two records from the file as contradicting the state agency psychologists' conclusions. In one, a 2010 Brown County intake form, she was feeling fatigued, hopeless and obsessed with what her boyfriend had done to her children. (Tr. 233) "She needs to see a psychiatrist as soon as possible." (Tr. 237.)

The intake form Plaintiff cites presents the Plaintiff at her worst, i.e., before significant

11

counseling and intervention with medication. Notably, this period coincided with the immediate aftermath of the assault of her children. Although Plaintiff accuses the ALJ of cherry-picking positive evidence, she is attempting to do the same on the other end. The purpose of a disability determination is not to determine whether a claimant with mental health problems ever had very bad periods; it is to determine, based on the whole record, whether the claimant would be able to work.

The other record cited by Plaintiff is a November 2010 record in which Plaintiff appeared haggard, with hygiene minimally attended to. (Tr. 283.) She also expressed feelings of worthlessness and appeared overwhelmed by her situation, which included the fact that she had four young children, two of whom were molested by a boyfriend, and she had recently been in jail for three months as a result of not reporting the incident. Once again, however, this record does not contradict the state agency psychologists' opinions, which were based on the entirety of the record through the review date in 2011. In fact, their opinions do not even account for the treatment with Dr. Pareek, which seemed to substantially help in 2012. In short, a few reports that were written during what must have been a very stressful period (not only the assault but the subsequent trial) do not contradict the state agency psychologists' opinions, and in fact evidence following their review in 2011 supports the finding of no disability.

**D. Vocational Expert**

Plaintiff raises two issues with respect to the vocational expert's testimony. First, prior to the hearing, Plaintiff's counsel wrote the ALJ asking that a subpoena be issued to require the VE to bring documents supporting his opinions to the hearing. (Tr. 216.) "I object to the vocational expert testifying about the number of jobs that may exist in the labor market unless the VE produces valid, reliable data of some sort to support such testimony." (Tr. 217.) The ALJ did not apparently

12

issue the subpoena, and thus the VE did not produce evidence or studies underlying his opinions. Plaintiff argues that this requires a remand so that the basis of the VE's testimony may be properly explored.

Plaintiff relies on *McKinnie v. Barnhart,* 368 F.3d 907, 910 (7th Cir. 2004), where the Seventh Circuit noted that an expert's facts and figures must be "available on demand." "A vocational expert is 'free to give a bottom line,' but the data and reasoning underlying that bottom line must be 'available on demand' if the claimant challenges the foundation of the vocational expert's opinions. . . . 'If the basis of the vocational expert's conclusions is questioned at the hearing ... then the ALJ should make an inquiry ... to find out whether the purported expert's conclusions are reliable.'" *Id.* (citation omitted).

The problem for the Plaintiff is that a blanket request in advance for documents does not mean that the attorney is "challeng[ing] the foundation of the vocational expert's opinions." *Id.* During the hearing, counsel did not raise any sort of challenge to the basis for the expert's conclusions about the number of jobs available, etc. Far from it: the hypothetical questions counsel posed to the VE, which were based on various limitations counsel believed were justified, were *premised* on the VE's expertise. (Tr. 52-54.) That is, counsel appeared to recognize that the VE had a firm basis for his opinions because counsel was attempting to use the VE's testimony to support his own client's purposes. A claimant cannot have it both ways. Given the absence of any objections, the ALJ was in no position to do anything but rely on the VE's testimony, since it had not been challenged. A challenge in district court more than a year later is hardly the forum for such an argument.

The second objection is that the VE relied on the Dictionary of Occupational Titles, which

13

Plaintiff argues is obsolete. This is a highly technical argument. First, the ALJ found that Plaintiff could perform her past work as a hotel or commercial cleaner, which Plaintiff had done for three years in the 1990s. This conclusion does not require a Dictionary of Occupational Titles but rather a simple conclusion that the Plaintiff could essentially perform the same job she had done in the past. There is no argument that cleaning jobs have changed materially in the last twenty years. It is true that the ALJ *also* concluded that there were a number of other jobs in the economy, and for these jobs she cited the DOT numbers corresponding to those jobs (e.g., hospital cleaner, hand packager, laundry laborer, product assembler, etc.) (Tr. 22.) (The ALJ imposed several limitations in her RFC, including limited contact with supervisors, co-workers and the public.) But because the ALJ found Plaintiff able to do her past work, the issue regarding the DOT is immaterial.

Even if it were relevant, no one doubts that the DOT is old and that jobs have changed since it was last updated in 1991. But the DOT is still routinely used in Social Security cases, and Plaintiff has not identified any precedent in which a VE's use of the DOT was reversible error. And Plaintiff never raised these issues when questioning the VE. The time to raise such issues would be while the VE was actually testifying about the number and kinds of jobs available. Instead, as noted earlier, by asking the VE hypothetical questions based on the Plaintiff's limitations, counsel appeared to have conceded the VE's expertise and the foundation for his opinions.

Finally, Plaintiff also makes a one-sentence argument based on *O'Connor-Spinner v. Astrue,* stating simply that the ALJ failed to explain how moderate limitations in pace, persistence and concentration ("PPC") translated into the performance of simple routine repetitive work. 627 F.3d 614 (7th Cir. 2010). That case holds that in most cases a limitation to "simple, routine tasks" will not adequately account for limitations in PPC.

That case is not applicable here because the ALJ's finding of moderate limitations in PPC was made at Step 3, not in the RFC. (Tr. 16.) Under the SSA's own rules, these findings at Step 3 concerning the paragraph B and paragraph C criteria for a listed impairment are explicitly not intended to be part of the RFC but are merely part of the determination as to whether Plaintiff's conditions qualify as severe. See SSR 96-8p, 1996 WL 374184 at *4. Instead, in determining Plaintiff's mental RFC, the ALJ relied upon the narrative section of the Mental Residual Functional Capacity Assessment completed by the Dr. Mushold, consistent with the SSA's Program Operations Manual System (POMS), which is available at https:// secure.ssa.gov/apps10/poms.nsf. *See* POMS, DI 24510.063.[2] In addition, the ALJ imposed a number of other limitations beyond "simple, routine tasks" to account for the Plaintiff's other limitations.

**III. Conclusion**

For the reasons given above, the decision of the Commissioner is **AFFIRMED**.

**SO ORDERED** this 9th day of September, 2014.

    /s William C. Griesbach
William C. Griesbach, Chief Judge
United States District Court

---

[2] For a more complete discussion of this issue, see *Kraus v. Colvin,* 2014 WL 1689717, at **12-16 (E.D.Wis. April 29, 2014).